



KRAUS & ZUCHLEWSKI LLP
Attorneys for Plaintiff
500 Fifth Avenue, Suite 5100
New York, New York 10110
(212) 869-4646
    Pearl Zuchlewski (PZ2926)

BANTLE & LEVY LLP
Attorneys for Plaintiff
817 Broadway, 6th Floor
New York, New York 10003
(212) 228-9666
    Lee F. Bantle (LB7036)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------X
SARAH E. HINDLIAN,    :

           **Plaintiff,**    :

    -against-    :    **COMPLAINT AND JURY DEMAND**

GOLDMAN SACHS & COMPANY,    :
                                                    09 Civ. _____

           **Defendant.**    :
-------------------------------------------------------X

        Plaintiff, Sarah E. Hindlian, by and through her attorneys, Kraus & Zuchlewski LLP and Bantle & Levy LLP, as and for her Complaint alleges as follows:

### INTRODUCTION

        1.    In this action, Plaintiff Sarah E. Hindlian, a former Vice President at Goldman Sachs & Company ("Goldman Sachs" or the "Firm"), who was terminated in 2008, brings this disability discrimination and retaliation action against Goldman Sachs. Ms. Hindlian alleges that the Firm, due to her disability and the Firm's regarding her as disabled, terminated her and discriminated against her in the terms and conditions of her employment. Ms. Hindlian further alleges that, due to her having engaged in protected activity, she was subjected to adverse action.

## PARTIES

2. Plaintiff Sarah E. Hindlian is an adult female citizen of the State of New York.

3. Defendant Goldman Sachs & Co. is a major financial services company authorized to do business in the State of New York. Goldman Sachs is an "employer" within the meaning of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §12111(5) and the New York Executive Law §296, is a "covered entity" within the meaning of the ADA, 42 U.S.C. §12111(2), and is a "person" and an "employer" within the meaning of the New York City Administrative Code, §8-102. Defendant does business at 85 Broad Street, New York, New York 10004.

## JURISDICTION

4. This Court has jurisdiction over this action pursuant to 28 U.S.C. §1331 because this action arises under the laws of the United States, specifically the ADA, 42 U.S.C.§ 12101 *et seq.*

## VENUE

5. Venue properly lies in this Court pursuant to 28 U.S.C. § 1391(b) and (c) because Defendant Goldman Sachs is located in and transacts business in the State and County of New York.

## PROCEDURAL BACKGROUND

6. On March 17, 2009, Ms. Hindlian filed a Charge of Discrimination with the United States Equal Employment Opportunity Commission ("EEOC") alleging that she had been subjected to disparate treatment because of her disability and retaliation, following and because of, her engagement in protected activity, all in violation of the ADA.

7.  Ms. Hindlian's EEOC Charge was timely because her counsel and counsel for Goldman Sachs had earlier signed a tolling agreement.

8.  On July 10, 2009, the EEOC determined that it was likely that it would be unable to complete its processing of Ms. Hindlian's charge within 180 days and issued a Notice of Right to Sue to her.

9.  This Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over the claims arising under New York Executive Law § 296 and the New York City Administrative Code (the "Administrative Code"), § 8-102.

10. Ms. Hindlian has fully exhausted her administrative remedies as required by the ADA, the New York Executive Law and the Administrative Code.

## **FACTS GIVING RISE TO RELIEF**

11. In July 2001, Ms. Hindlian joined Goldman Sachs as an Analyst in its U.S. Shares Trading Group.

12. During her first two years at Goldman Sachs, Ms. Hindlian worked as a Junior Trader in the Communications, Media and Entertainment sector. She was the first member of her Financial Analyst class promoted to Senior Trader.

13. Ms. Hindlian was frequently the highest ranked monthly Market Maker on Wall Street in the areas of the software sector based on block trading volume.

14. In 2005, Goldman Sachs promoted Ms. Hindlian to Vice President.

15. As a Vice President, she was a member of a proprietary trade idea generating unit for Goldman Sachs's institution businesses. Specifically, she was employed in the Americas Trading Unit of the Firm's Franchise Risk Management Department ("FRM").

16. Ms. Hindlian worked closely with single stock traders, derivatives traders and senior management to implement multi-strategy proprietary trades and to hedge the Firm's block trading risk.

17. Ms. Hindlian's manager in the Americas Trading Unit was Managing Director Ted Wang.

18. Through the end of 2006, Ms. Hindlian's performance appraisals and managerial feedback were consistently excellent.

19. Ms. Hindlian began to experience back problems in late 2004, and during the next two years underwent a series of tests and procedures, none of which produced an improvement in her condition.

20. Plaintiff was diagnosed November 2004 as suffering from degenerative disc disease which, among other things, involved significant damage to her left leg as a result of a fully "blown" disc at L4/L5 and severe herniations at all levels of her lumbar spine.

21. As a result of this condition, Ms. Hindlian experienced extreme pain when attempting to place her foot on the ground and also suffered from frequent periods of weakness. As a result, she was unable to walk. Her condition also made it impossible for her to bend, twist her neck, or lift her arms.

22. For three months in 2007, she was confined to a wheelchair.

23. Ms. Hindlian's condition substantially limited and severely restricted the major life activities of walking, dressing and eating.

24. In early 2007, Ms. Hindlian's physicians advised her that she required spinal surgery in the near future.

25. Ms. Hindlian arranged with the Firm to take a short term disability medical leave in order to undergo and recuperate from back surgery.

26. On April 12, 2007, Ms. Hindlian underwent a major back operation. It was not successful.

27. Due to her physicians' grave concerns about possibly permanent disability – which entailed losing the use of both her legs – due to extensive nerve damage to her spine and disc damage, Ms. Hindlian underwent a second back operation in June 2007. This operation was also not ultimately successful in curing Ms. Hindlian's spinal condition, although her short-term recovery prospects at the time appeared favorable.

28. Ms. Hindlian returned from short term disability leave to her position at Goldman Sachs in September 2007.

29. At all relevant times, Ms. Hindlian was a "qualified individual with a disability" as defined by the ADA, 42 U.S.C. § 12111(8), and has been able to perform the essential functions of her position.

30. Following her return to the Firm, Ms. Hindlian could not walk without using a cane.

31. Mr. Wang told Ms. Hindlian that his neighbor, whom he said was a retired "back doctor," had advised him that all Ms. Hindlian needed to do to "get better" was to exercise and lose weight.

32. In October 2007, Ms. Hindlian was informed by Human Capital Management that she was to receive an annual performance review that month. This was highly unusual, as Ms. Hindlian had not been present at the Firm during much of the period covered by the review.

33. Ms. Hindlian requested that the review, which should not have taken place at that time, not be held. Mr. Wang denied her request.

34. At her annual performance review meeting with Mr. Wang on October 31, Mr. Wang told Ms. Hindlian that she was not permitted to be sick any more.

35. Mr. Wang referred to Ms. Hindlian's "back thing" and then stated that he had thought she was "a tough girl," but that in light of her medical problems he was not "so sure anymore."

36. At her early 2006 review, prior to her first spinal surgery, Mr. Wang had called Ms. Hindlian "very smart," "talented," a "culture carrier of the firm" and a "real team player."

37. During the last three months of 2007, Mr. Wang restricted Ms. Hindlian's trading, and did not permit her to trade during the period immediately after her return.

38. Ms. Hindlian was not able to join her two colleagues and sit with the Technology Shares Trading team on the trading desk because its seats were not handicap-accessible for her. Although she purchased a back support device, Ms. Hindlian was placed in a corner by the Convertible Bonds Sales team, which placed her at a significant disadvantage in carrying out trading activity. Ms. Hindlian's requests to Mr. Wang for closer access to the "tech team" were not granted.

39. Ms. Hindlian also was denied access to outside research coverage by Mr. Wang, coverage which her FRM Technology peers were allowed to have.

40. Outside research coverage and proximity to the "tech team" are critical to profitability. Mr. Wang's denial of these tools, which other traders were provided with, significantly impeded Ms. Hindlian's ability to generate revenue.

41. Ms. Hindlian again met with Mr. Wang in December 2007 for a compensation review. At that time, Mr. Wang informed Ms. Hindlian that her bonus compensation for 2007 would be reduced by 11%. In explaining this substantial cut in Ms. Hindlian's compensation, Mr. Wang declared that "this is not a charity" and told Ms. Hindlian "you were out for half a year."

42. Goldman Sachs has a policy of not pro-rating bonuses for employees who are absent on approved leave for part of a year.

43. In 2007, the Franchise Risk Management Department was up more than 100% in profits over the preceding year, and Goldman Sachs had a profitable year as well.

44. During this period, Ms. Hindlian's condition appeared to have improved and she came to believe that a complete recovery might be possible.

45. In approximately early January 2008, Ms. Hindlian requested permission to attend a key industry conference in Las Vegas that was critical to her ability to maintain the connections and business relationships that she needed to successfully carry out her responsibilities.

46. Mr. Wang denied Ms. Hindlian's request to attend the conference, stating that he did not wish to place the Firm at risk because something might happen to her back while on Goldman Sachs's time.

47. Mr. Wang had never requested any medical information from Ms. Hindlian that would have raised any objective concerns about her ability to travel.

48. Nonetheless, later in January Mr. Wang told Ms. Hindlian that she was "highly regarded", had "excellent relationships in the Franchise business" and that her "stock opinions were highly valued."

49. Mr. Wang then offered her a promotion to a higher position involving analyzing large block trades from the Capital Markets Group. Ms. Hindlian was pleased with the offer and thanked Mr. Wang.

50. Ms. Hindlian never received the promised promotion.

51. During the first two months of 2008, Ms. Hindlian's medical condition, which had not been cured by the 2007 operations, began to deteriorate again.

52. In February, Ms. Hindlian was forced to take several weeks of "vacation" leave for a series of doctors' visits and tests.

53. Ms. Hindlian's physicians advised her that she required another spinal operation.

54. During early 2008, Mr. Wang made a number of sarcastic, critical remarks about Ms. Hindlian's medical condition. On one occasion, Mr. Wang remarked to another trader that he "could only guess what might be wrong with [Ms. Hindlian] now."

55. While Ms. Hindlian was meeting with her physicians, Mr. Wang insisted on a series of bad trades in her book of business.

56. On March 25, 2008, Ms. Hindlian sent Mr. Wang an e-mail telling him she would need to undergo back surgery in the near future and would require a medical leave of absence beginning in approximately one week.

57. On April 3, 2008, one day prior to when Ms. Hindlian was scheduled to begin her short term disability medical leave, she met with Mr. Wang and Managing Director Paul Russo.

58. At the meeting, Mr. Wang and Mr. Russo told Ms. Hindlian that the Firm was terminating 10% of its workforce, and that the decision as to who would be dismissed was based on performance.

59. Ms. Hindlian's performance was at least in the middle range of her peers in the Americas Trading Unit. She pointed out to Mr. Wang that at least six of the people on her team had significantly lower profit and loss statements that did she. Ms. Hindlian later learned that seven traders of the eleven in her group were behind her in profit and loss performance. One co-worker was down more than $10 million for the second consecutive year.

60. Despite these facts, Mr. Wang informed Ms. Hindlian that she would be terminated as soon as she completed short term disability leave.

61. When Ms. Hindlian told Mr. Russo "you are laying me off because of my spinal problems," he responded by telling her to talk to one of Goldman Sachs's attorneys.

62. No reduction-in-force in the Franchise Risk Management Department or Americas Trading unit took place during the spring of 2008.

63. Among those retained were Timothy O'Reilly, who had lost between $10 million to $20 million during each of the four preceding years, and Joseph Moore – one of the other two traders in Ms. Hindlian's Tech Sector team – whose 2007 losses exceeded $500,000 at the time Ms. Hindlian was terminated.

64. Ms. Hindlian was given a severance agreement by Goldman Sachs.

65. Thereafter, Ms. Hindlian, through her counsel, told Goldman Sachs that her termination was based on unlawful discrimination.

66. Goldman Sachs then presented Ms. Hindlian with a new severance agreement that contained a substantially reduced amount of severance pay.

67. The unlawful employment practices complained of herein were intentional.

68. The unlawful employment practices complained of herein were done with malice or with reckless indifference to the federally protected rights of Ms. Hindlian.

## COUNT I

**(Disparate Treatment in Violation of the Americans with Disabilities Act)**

69. Plaintiff Hindlian incorporates by reference and re-alleges each of the allegations contained in paragraphs 1 through 66 of this Complaint with the same force and effect as if set forth here in full.

70. Goldman Sachs subjected Ms. Hindlian to different terms and conditions of her employment based on her disability. In the alternative, assuming Ms. Hindlian does not have a qualifying disability under the ADA, Goldman Sachs discriminated against her because it regarded her as having a disability and a record of a disability, in violation of the ADA, 42 U.S.C. § 12112.

71. Ms. Hindlian was discriminated against in the terms and conditions of her employment and terminated because of her actual, perceived or record of disability.

72. As a direct and proximate result of these unlawful acts by Defendant Goldman Sachs, Plaintiff Hindlian has suffered and continues to suffer lost wages, benefits and entitlements, damage to her career, pain, suffering, humiliation and emotional distress.

## COUNT II

**(Retaliation in Violation of the Americans with Disabilities Act)**

73. Plaintiff Hindlian incorporates by reference and re-alleges each of the allegations contained in paragraphs 1 through 66 of the Complaint with the same force and effect as if set forth here in full.

74. Defendant Goldman Sachs retaliated against Ms. Hindlian because of her protected activity in violation of the ADA, 42 U.S.C. § 12203.

75. Defendant withdrew its initial severance proposal and replaced it with a less advantageous one in retaliation for Ms. Hindlian's protected activity.

76. As a direct and proximate result of this unlawful act by Defendant, Plaintiff Hindlian has suffered lost compensation.

## COUNT III

**(Disability Discrimination in Violation of the New York Executive Law § 296)**

77. Plaintiff Hindlian incorporates by reference and re-alleges each of the allegations contained in paragraphs 1 through 61 of the Complaint with the same force and effect as if set forth here in full.

78. Defendant Goldman Sachs discriminated against Ms. Hindlian because of her disability, perceived disability, and record of disability in violation of New York Executive Law § 296. Plaintiff was subjected to disparate treatment because of her disability (perceived, actual and record of).

79. Defendant Goldman Sachs subjected Ms. Hindlian to discrimination in the terms and conditions of her employment and then terminated her.

80. As a direct and proximate result of these unlawful acts by Goldman Sachs, Ms. Hindlian has suffered and continues to suffer lost wages, benefits and entitlements, damage to her career, pain, suffering, humiliation and emotional distress.

## COUNT IV

**(Retaliation in Violation of the New York Executive Law § 296)**

81. Plaintiff Hindlian incorporates by reference and re-alleges each of the allegations contained in paragraphs 1 through 66 of the Complaint with the same force and effect as if set forth here in full.

82. Defendant retaliated against Ms. Hindlian because of her complaint about what she reasonably believed to be discriminatory conduct on the part of Goldman Sachs. Goldman Sachs withdrew its initial severance proposal and replaced it with a less advantageous one in violation of the Executive Law.

83. As a direct and proximate cause of this unlawful act by Defendant Goldman Sachs Plaintiff Hindlian has suffered lost compensation.

## COUNT V

### (Disability Discharge in Violation of the New York City Administrative Code, Chapter 8)

84. Plaintiff Hindlian incorporates by reference and re-alleges each of the allegations contained in paragraphs 1 through 66 of the Complaint with the same force and effect as if set forth here in full.

85. Defendant Goldman Sachs discharged Ms. Hindlian from her employment by Goldman Sachs because of her disability, the fact it regarded her as disabled, and her record of disability in violation of the Administrative Code.

86. As a direct and proximate act of these unlawful acts by Goldman Sachs, Plaintiff Hindlian has suffered and continues to suffer lost wages, benefits and entitlements, damage to her career, pain, suffering, humiliation and emotional distress.

## COUNT VI

### (Retaliation in Violation of the New York City Administrative Code, Chapter 8)

87. Plaintiff Hindlian incorporates by reference and re-alleges each of the allegations contained in paragraphs 1 through 66 of the Complaint with the same force and effect as if set forth here in full.

88. Defendant Goldman Sachs retaliated against Ms. Hindlian because of her complaint about what she reasonably believed to be discrimination of the part of Goldman Sachs. Goldman Sachs withdrew its initial severance proposal and replaced it with a less advantageous one in violation of the Administrative Code.

89. As a direct and proximate result of this action by Defendant Goldman Sachs, Ms. Hindlian has suffered lost compensation.

WHEREFORE, Plaintiff Sarah E. Hindlian respectfully prays that this Honorable Court:

1. Enter judgment on her behalf against Defendant Goldman Sachs on all counts contained herein;

2. Award Plaintiff Hindlian compensatory and other damages;

3. Award back pay and front pay to Plaintiff Hindlian;

4. Award punitive damages to Plaintiff Hindlian;

5. Award Plaintiff Hindlian her court costs, expenses, attorneys' fees, prejudgment interest, and post-judgment interest;

6. Declare that Defendant's conduct is in violation of the Americans with Disabilities Act of 1990, Section 296 of the New York Executive Law, and Chapter 8 of the New York City Administrative Code;

7.    Grant such other and further relief as this Court deems just and proper.

Dated: September 22, 2009
       New York, New York

                              KRAUS & ZUCHLEWKSKI LLP
                              BANTLE & LEVY LLP
                              Attorneys for Plaintiff
                                 Sarah E. Hindlian

                              KRAUS & ZUCHLEWKSKI LLP

                              By: _____
                              Pearl Zuchlewski (PZ2926)
                              500 Fifth Avenue, Suite 5100
                              New York, New York 10110-5197
                              (212) 869-4646

                              BANTLE & LEVY LLP

                              By: _____
                              Lee F. Bantle (LB7036)
                              817 Broadway, 6th Floor
                              New York, New York 10003
                              (212) 228-9666